Oyez, oyez, oyez. The Honorable Appellate Court, 5th District, State of Illinois is now in session. The Honorable Justice Cates presiding along with Justice Welch and Justice Wharton. The first case this morning is number 5-170259, People v. Ford. Arguing for the appellant, Tomon Ford, is Unsam Nam. Arguing for the appellate, People of the State of Illinois, is Jennifer Camden. Each side will have 10 minutes for their argument. The appellant will also have 5 minutes for rebuttal. You'll see the digital timekeeping device. When time has expired, I will bang the gavel. And finally, remember, only the clerk is permitted to record these proceedings today. Okay, Ms. Unsam Nam, you may begin. May it please the Court, Counsel, Assistant Appellate Defender Unsam Nam on behalf of Tomon Ford. Here, after a bench trial, the trial court found Tomon guilty of first-degree murder. It also found that he personally discharged a firearm that proximately caused death. Tomon was 18 years old at the time of the shooting. Subsequently, Tomon was sentenced to 55 years in prison, 30 years for the murder, and 25 years for the firearm enhancement. On appeal, he raised various issues regarding his 55-year de facto life sentence, where he will be released from prison at the age of 73, if he even survives that long. I'm going to discuss buffer in a second, but today we're asking that, based on his arguments, Tomon ask that this Court vacate and vacate his sentence and remand for a new sentencing hearing, or alternatively to reduce his sentence. Before getting directly into his sentencing argument, we want to discuss buffer and his claim that 55 years is a de facto life sentence for him. As the state notes on page 12 and 13 of its brief, a de facto life sentence is defined as a mandatory term of years in prison that cannot be served in one lifetime. The state also acknowledges that the likelihood that Tomon will outlive his 55-year prison term, which is to be served at 100%, and he also doesn't, by two years he missed that qualification for the recent parole statute for those under 21, so he won't get an early parole review. So he's going to be out at 73, and the chances of him outliving that 55-year mandatory sentence is slim. As Tomon stated in his brief on pages 21 and 23, that 73 years is significant here and should be a part of this Court's consideration for all of his sentencing issues, because the research has shown that inmates in prison, especially if you go in at a younger age, their lifespan is drastically reduced. So I think there was a research article cited in Tomon's brief that half of the inmates don't leave prison before 55, or sorry, they die in prison before the age of 55, and there's other research about inmates dying at the age of 60, 64, so he's definitely above that line. And as this Court knows, in Buffer, our Supreme Court has kind of delineated that line for juveniles at 40 years, and he was an adult in that he was 18, but he was three, four months beyond 17. So, really, aren't you asking that this Court reduce his sentence by about 10 years? I mean, anyone convicted of murder, the minimum is 20 years. And then the firearm enhancement is an automatic 25 years. I mean, the legislature has chosen for any 18-year-old to put 45 years on in a conviction for murder with a firearm, right? That's correct, Your Honor, for our excessive sentencing argument, but if we're going for the proportionate penalties argument, we're asking that that firearm enhancement might even be a questionable aspect here if we can establish that Tomon was closer to being a juvenile to a convict. Where do we draw the line? One month, two months, three days? Well, I think, Your Honor, that's why this case is unique, and we're arguing an as-applied proportionate penalties argument, and that the record is complete here because, as this Court knows, Tomon had a bench trial. The trial court was able to view, observe, review all of his co-defendants' testimonies, and here, as this Court knows, he has a few co-defendants. Eric Carter, he was 19, Christian West, 17, DeMarlo Smith, 17, Jaquan Amonette, 17, and Arthur Hinton, who's also known as his rat name by Dink, he was under his 20s, and Tomon kind of falls right in the middle. He's 18. He's three, four months above being 17, so this case is unique in that, although his co-defendants, as far as I know, no one was charged with anything. No one was convicted. It was just Tomon. If Tomon was in Christian's shoes or DeMarlo's shoes, you know, by four months, he would be considered a juvenile, and especially in this case, I think the facts kind of speak for themselves. I think there's quotes in the trial transcript about this being a silly rat battle, that the rappers were all amongst teens, so Tyrae London, Keith Sanders, that was kind of the conflict between Dink and DeMarlo and Tyrae and Keith. They're all teenagers, and this is teenagers being on Facebook, quoting, dissing each other, tagging each other on Facebook to talk about whose neighborhood or whose street is better. There's a lot of YouTube videos in this case about each rapper making rap videos on YouTube, so the facts in this case show that this is all teenagers acting irresponsibly, acting immaturely, and this is not to diminish the fact that R.J. lost his life. R.J. was truly, as the state said, an innocent bystander. He was just at the recreational center, but all the youth involved in this case stated that, you know, the plan wasn't to, they didn't plan on shooting someone. This was all just a group of youth, a group of teenagers with more than one gun, driving by, thinking that they were going to shoot it into, you know, thin air, not thinking about where the bullets could possibly land, so I think... Excuse me, how much do you think that this behavior was acting out and imitating what we actually have seen in the professional rap industry? Well, I think it really reflects a lot. I think it's Timon and Dink, when they testified, they testified about, you know, I talk about guns, or at least for Dink, this is the one that was kind of involved in that Facebook rap battle, was Dink. He's the one that put out the two rap videos Where He At or Where You At, parts one and two, where he talks about, you know, guns and shooting and all this violence that I think these teenagers are, and Timon says so himself, Timon says in his testimony, you know, he thought that if he beat this rap, beat this conviction, that he would be famous. All they want to be is rich and famous. They want to be like all those rappers who have succeeded, and it's, you know, sorry for my language, but it's crazy that they think that beating a murder conviction or having this murder conviction is their route to being famous, being popular, being that rap star that, you know, all these teenagers want to be, and I think that's very clear in this case, and that's why this case, the record seems developed here where it is a bunch of teenagers. Again, they're 17, 18, 19. They're all engaged in this rap battle. They're all trying to be cool, and I think in the state's closing argument, the state even says they're all trying to be tough. They're all trying to act cool, and they, and it seems very clear that no one, no one thought about the consequences of what they were doing. They were just trying to be that cool, tough rap star from that street, that neighborhood. Counselor, the victim, what did the victim have to do with rap? Anything? Your Honor, of course, so the victim did not, and as I stated earlier, the victim was truly just a child. Walking out in the yard. That's right. He was, that's right. He was playing basketball in the yard. He wasn't a part of this. It's just that on Facebook, the teenagers were actually involved, and Taman wasn't a part of the Facebook battle, the Facebook tagging and dissing, but the Facebook, you know, chat back group, they were talking about meeting at this recreational center, so it seems very apparent that none of these teenagers thought about what they were doing, and again, Taman, it just, just falls four months above, so my time is up. It's kind of dangerous to go to the recreational center. You might get shot. Yes, Your Honor, and I think that's what, that's what this shows, is that they, they don't think about the risk. They can't think about the risks, because as the House Court noted, the research shows that even adults, you know, 17, 18, 19, 20, their brains are still developing to kind of grasp the consequences. We haven't talked at all, we haven't talked at all about the victim. What do we know about the parents of the victim, the victim? It kind of, didn't it destroy the read her victim impact statement. They talked about, you know, RJ, the impact on the family, and I think the trial court did recognize that the trial court talked about how, you know, this was a huge, huge, devastating, unfortunate event for RJ's family, but I think the focus here, because we're not, we're not diminishing the fact that RJ lost his that he was truly that innocent, you know, victim, that was the, was the defendant in this case, was he the one sitting in the windowsill and shooting across the top of the car? Well, that was, that was the evidence that was produced at trial. Timon does, from the beginning, he maintained his innocence. He was remorseful at the sentencing hearing, but he does maintain that he was innocent. How many shots were fired by the defendant? The trial testimony is kind of all over the board. Some say, I think there was three, some said there was like five and then four. It does seem like there were more than, more than one or two bullets, but I, the exact number, um, based on the witness testimonies kind of are out there. Thank you, counsel. Thank you, your honor. Thank you, counsel. Okay. State, Ms. Camden. Thank you, your honor. May it please the court, counsel, Jennifer Camden on behalf of the people. The defendant, the defendant's raising constitutional challenges to his sentence that these are as applied challenges and the held that the appellate court has an insufficient record to decide the merits of as applied challenges to a sentence raised for the first time on direct appeal and that they're more properly raised in a post-conviction proceedings. And in this case, as in Harris, the defendant is raising for the first time on direct appeal as applied eighth amendment and proportion of penalties challenges to his sentence. As in Harris, the defendant's claims argue that new developments in neuroscience suggest that the defendant had a particular characteristics of described in Miller versus Alabama and that sentence was unconstitutional for those reasons. And as in Harris, the defendant is arguing in this case, there was no evidentiary hearing and no factual findings in the court below regarding how evolving science on juvenile maturity applied to this adult defendant in particular. So under the Supreme court's decision in Harris, the record in this case is not sufficiently developed to review his as applied constitutional claims. And this court should decline to consider them and move on to addressing and rejecting the defendant's excessive sentencing claim. Your Honor, Justice Cates asked where we draw the line and the state's response is that the appellate court cannot draw a line in the factual vacuum on direct appeal. And that's why this claim is more properly raised in post-conviction proceedings. Now the defendant in his argument claims that the record in this case does contain the facts required to consider his as applied claims. And he points to facts contained in the record concerning the circumstances of the crime and points to facts in the pre-sentence investigation report. But none of those facts that the defendant draws from the record, take the place of the evidentiary hearing and the factual findings that the owner of Supreme court in Harris ruled was required, is required for consideration of as applied claims. And I'd also note that the defendant in Harris raised that same argument and the court in Harris rejected it at paragraph 46. The defendant in this case cites Holman in support of his argument that the record was sufficient. I'd note that the defendant in Harris also cited Holman and the court in Harris distinguished that in Holman, the defendant was under 18 when he was sentenced. So the issue on appeal was the legal issue of whether his sentencing hearing complied with Miller. In this case, the issues are factual, whether and or how the brain science that is now cited by the defendant, which was not cited or argued in the trial court applied to his personal level of culpability or rehabilitative potential. I'd also note that in the couple of years since the Supreme court's decision in Harris, its reasoning has been followed by the appellate court in the Vega and Landerman cases, which are cited in the briefs and also by this court last month in another case called Harris, which was the subject of a motion by the state a couple of weeks ago. I'm moving on to, I'd like to respond to a couple of points raised in with regard to the merits of these claims. The defendant cited the house two case. I'd like to note that in that case, this was a 19 year old defendant sentenced to mandatory natural life based on accountability theory. And the appellate court held that his sentence violated proportion of penalties where he was not present at the scene, did not help plan the offenses and had no violent criminal history. Also, that was a post-conviction case. In this case, it was a discretionary term, not natural life. The defendant was the sole shooter who brought a loaded gun to a pre-planned fight. And the defendant did have a violent criminal history. And this case is again, arising on direct appeal, not in a post-conviction. I'd also note that the Illinois Supreme Court did grant a petition for leave to appeal in the house two case. The defendant also challenges the mandatory application of the firearms enhancement and cites in the reply brief, the Gibson case. I note that in Gibson, the defendant was 15. So that's a case involving mandatory sentencing of juveniles not applicable here. And that the Gibson, like the defendant was in house, was convicted in part on an accountability theory. And that's why one of the firearms enhancement in Gibson applied. And again, in this case, the defendant was an adult who personally shot and killed an 11-year-old child. Also in the state's answer brief, the state cited Sharp, a case holding that firearms enhancements for adults do not violate proportionate penalties. So because the record is insufficient under Harris to consider these as applied claims, this court should decline to review them and consider only the excessive sentencing claim. And in that case, or on that claim, the defendant cannot show that court abused its discretion. The sentencing range for first degree murder was 20 to 60 years. The court imposed a sentence of 30 years, which was of course on the lower end of that scale, and less than the 45 years that the state asked for. These range on the firearms enhancement was 25 to life. And the court imposed the minimum firearms enhancement of 25 years. On this record, there was no abuse of discretion. Now the defendant in the reply brief suggests that the court failed to consider the defendant's age. The apparent source of that is the fact that the court did not mention the defendant's age when pronouncing sentence. But that doesn't mean that this court can presume that the court ignored it. In fact, the opposite presumption applies, and the sentencing court doesn't have to state each factor that it considered. The defendant's age was of course in evidence of trial, was in the PSI, and was also the subject of defense counsel's argument. And the court said in sentencing the defendant that it considered all of these factors. And these same arguments are responsive to the defendant's other argument, which is that the court didn't consider the defendant's rehabilitative prospects when sentencing him. Again, the court may not have used the word rehabilitation, but that doesn't mean that the court ignored these factors. I'd also note that rehabilitation potential is not entitled to more weight when sentencing than the seriousness of the offense, and that this court must not substitute its judgment for that of the trial court in weighing these factors. And with regard to the seriousness of the offense, I'd like to discuss the evidence of that offense. Now there were six people in the car, including the defendant, and the other five people in the car all testified for the state. And four of those witnesses testified that before they left the home of one of these people to drive to the location of a pre-planned fight with another group of people, the defendant showed his friends his loaded gun. These witnesses testified that the defendant had the only loaded gun in the car, and that he carried it in the car to the designated area where the fight was to occur. And that the defendant sat on the door ledge of the car that was driving through that area, pulled out his gun, emptied all of the bullets in the gun into a crowd outside the community center. And the result was that an 11-year-old boy was shot in the back, and he died soon thereafter. I'd also note that the driver of this car testified that after the shooting, the defendant was, quote, excited. And he said that he, quote, wasn't shooting in the air. That's what the defendant said. The defendant said after the he, quote, caught a body, or that he, quote, body dropped. And that's at page 176 of the record. So this record shows a level of premeditation, planning, intentionality, and it also shows the defendant's character. And on that record, a 30-year sentence for first-degree murder and the statutory minimum firearms enhancement was not an abuse of discretion. And I'd note that in the reply brief at page eight, the defendant cites some other cases in which the appellate court did reduce a sentence in light of the defendant's age. In one of them, Clark, the defendant had no prior felony convictions and presented extensive evidence that he was a respectful and polite young man. In this case, the pre-sentence investigation paints a very different picture of a very different young man. I'd also note that in that case, the appellate court reduced his sentence for murder to 36 years. That's still more than the 30 years that defendant, in this case, got. In the Brown case, again, the defendant had no criminal history and was convicted on an accountability theory, as opposed to this case where the defendant was not convicted on an accountability theory and did have a criminal history. And in the Maldonado case, again, the defendant had no criminal history and was the sole shooter in a sudden gang dispute. In this case, the defendant did have a criminal history. And again, there was a plan to drive together to the scene of what was scheduled to be a fight. In fact, there was testimony that the plan was either to engage in a fight or to fire warning shots in front of this crowd. The defendant on appeal notes that he maintained his innocence. I would note that all five of the state's witnesses who were in the car when the defendant shot and killed this boy testified that the defendant was the only person in the car who had long hair and there was an eyewitness, completely uninvolved in this, who was a resident of the housing development where the shooting occurred, who saw the whole thing from her window and saw that the shooter had what she described as neck-length dreadlocks or puffy twists. And the unrefuted evidence in this case is that the defendant, at the time of the shooting, did in fact have shoulder-length dreadlocks. I see that my time has expired. So for these reasons, I've requested the court affirm. Thank you. Thank you, Ms. Camden. Ms. Zunon? Mr. Honors, I have a few points in rebuttal. The first point is, of course, if this court finds that the record is not fully developed prematurely, these as-applied constitutional challenges are premature, then Taman does ask that this court allow him to fully raise that in collateral proceedings. But the argument here is that it is because of the specific facts, because of the bench trial, because of the witnesses at Taman's sentencing hearing. And Taman, we would ask that this court kind of look at that quote in our motion to cite additional authority for people v. Suggs from the 2nd District. For this court to jump or leap to 21-year-olds or 23-year-olds, that would be a huge leap. But here, it's a short step for Taman, who was 18, versus his three or four co-defendants who were 17. It's a short step for this court to reach him at 18. Also, opposing counsel discusses Taman's co-defendants. They're all related or friends, so I think this court should take that into consideration when considering his sentencing arguments. As far as I know, there's the co-defendants. Some of them are cousins. Some of them grew up together and considered each other brothers. They were all a part of the YouTube video. They were all in that video. Taman does seem like the odd one out here. He's not really related to anyone. The testimony said that they knew Taman. Taman was an acquaintance. They would see each other at parties, but Taman wasn't close in this group like the other five. So his co-defendants were close. They all testified against him. They all got charges or convictions. It was just Taman. So I think that should be a part of this court's consideration. Also, regarding House 1 and House 2, as opposing counsel mentioned, there's a PLA that's granted, but we think that the emerging adult science has been incorporated into Illinois law through House 1 and House 2. So that emerging adult line of research saying not only does juveniles have an underdeveloped brain, emerging adults up until even 21, 22, 23, some say even 25, their brains are still developing, and this is that classic case where a group of teenagers think that they can get famous through this rap battle, being rap stars on YouTube. They want to be that YouTube famous person. So here that brain science for emerging adults should be incorporated. That's already a part of Illinois law. It's mentioned in numerous cases following House. And last point we want to talk about Taman's history. So Taman's criminal history as the state on appeal and below discussed, that's truly a juvenile record. So all of this juvenile law that the state's arguing doesn't apply in this case, that all applies for his juvenile delinquency record that the state that he did when he was a juvenile, losing his temper, trying to pick fights with his friends. This is all qualities of youth that they're distinctive from youth, you know, not being able to focus, getting into arguments with teachers. Of course, not all students are like this, but Taman's social and personal history kind of gives an idea to this court of why. So he was abused as a child. His home life, although he states that he had a good relationship with his family, his home life or his housing situation seems a bit unstable based on his testimony and, or based on the sentencing hearing evidence that was presented and the PSI. He has numerous mental health issues. He has substance abuse issues from when he was a ADHD, ADD, ODD, mood disorders. He had this depression. He hurt himself. So all of this stuff I think should be incorporated in this court's decision. Unless there's any other questions, we ask that this court reverse or vacate and remand or reduce his sentence.